David Sanford,

      Plaintiff(s),

v.

AXA Equitable Life Ins. Co., et al.,

      Defendants.

_____/

Case No. 09-12190

Honorable Nancy G. Edmunds

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION SUMMARY JUDGMENT [47]

Plaintiff David Sanford ("Plaintiff") filed this wrongful termination action alleging that Defendants AXA Equitable Life Insurance Company ("AXA Equitable"), AXA Advisors, LLC ("AXA Advisors"), and AXA Network, LLC ("AXA Network"), (collectively, "Defendants"), reverse-race discriminated against him when they terminated his employment, breached his employment agreements with him when they terminated him, and tortiously interfered with Plaintiff's business prospects. Defendants deny Plaintiff's allegations and argue that (1) res judicata bars Plaintiff's claim, (2) Plaintiff cannot establish a prima facie case of reverse-race discrimination and even if Plaintiff could establish such a prima facie case, he still has failed to establish that Defendants' reason for terminating him was pretext, (3) Defendants did not breach any contract between Defendants and Plaintiff, and (4) Defendants did not tortiously interfere with Plaintiff's post-Defendants employment business prospects.

This matter is now before the Court on Defendants' Motion for Summary Judgment [47]. For the reasons stated below, the Court GRANTS Defendants' Motion for Summary Judgment.

## I. Facts

To survive summary judgment, Plaintiff must bring forth evidence creating a genuine issue of material fact. Regarding his reverse-race discrimination claim, Plaintiff must show that after Defendants terminated him, Defendants replaced him with a Non-Caucasian or treated him differently than a similarly situated Non-Caucasian. If Plaintiff makes that showing, he must then show that Defendants came to an unreasonable and unjustified conclusion to terminate him. Addressing his contract claim, he must persuade the Court that there is a question of fact as to a breach. For his tortious interference claim, Plaintiff must establish that Defendants intentionally hindered Plaintiff's ability to find future work. Finally, as a threshold matter, Plaintiff must show how his former action against AXA Equitable does not bar this action against Defendants.

### A. The Parties

AXA Equitable is a New York corporation that provides life insurance, annuity products, and assistance to the financial services market. AXA Advisors and AXA Network sell these products and services through their retails sales force of agents.[1]

---

[1]There are various AXA branches throughout the United States. This motion's relevant events involved employees from the Great Lakes Branch, a subsidiary of AXA Equitable. (Audas Dep. at 10; Defs.' Mot. for Summ. J, Ex. 24.) The Great Lakes Branch's headquarters is in Troy, Michigan and, in 2006, was managed by three co-managers, Benjamin Hudson ("Hudson"), Timothy Mackie ("Mackie"), and Sedric L. Audas ("Audas"). Midwest Divisional President, Staley Gentry ("Gentry"), supervised the three co-managers.

In 1998, Plaintiff began his association with Defendants as a Pre-Employment Prospective Associate. On July 1, 2000, Plaintiff signed an agreement with Defendant AXA Network to sell insurance policies and annuity contracts. A year later he signed a Registered Representative Agreement with AXA Advisors. As a registered representative, Plaintiff's duties were to acquire clients and assist in insurance and investment transactions. In 2004, Plaintiff became a district manager of the Saginaw, Michigan facility, part of the Great Lakes Branch, and signed a District Manager Agreement with AXA Equitable.[2]

## B.    The Investigation That Led to Plaintiff's Termination

### 1.    Defendants Receive the Initial Complaint Against Plaintiff

On February 7, 2006, Joanne Bingham-Nelson ("Bingham-Nelson"), Director of Human Resources, AXA Advisors, Midwest Division, received a phone call from Byron Glaspie ("Glaspie"), a financial advisor with AXA Equitable.[3] This phone call set into play

---

[2]   Defendants argue in a footnote that Plaintiff does not have standing to bring a reverse-race discrimination claim against AXA Network and AXA Advisors, since he was an independent contractor under those contracts and Michigan's civil rights act only applies to employees and not independent contractors. *See Ives v. City of Detroit*, No. 208741, 2000 WL 33415956, at *2, n. 4 (Mich. Ct. App. July 1, 2000.) Defendants then cite various cases for the proposition that the AXA Network and AXA Advisors contract with Plaintiff only created an independent contractor status. (Defs.' Mot. for Summ. J. at 19, n. 3.) Because Plaintiff's reverse-race claim fails regardless, the Court will not discuss Defendants' standing argument.

[3]In 2006, Bingham-Nelson was the Director of Human Resources, AXA Advisors, Midwest Division. Her duties included full human resources support for the division, including compensation and benefits, recruiting, employee relations, training, and development.

Glaspie began work at AXA Equitable shortly after his graduation from Stanford University in 2001. He worked in the Downtown Detroit office, a part of the Great Lakes Branch, as a financial advisor, assisting individuals in making decisions with life insurance and

3

a sequence of events that led to Plaintiff's termination.  Glaspie asked to meet with Bingham-Nelson in person, claiming that the call touched upon sensitive subjects.  (Bingham Dep. at 19-20, Defs.' Mot. for Summ. J., Ex. 9.)  Although she was reluctant to do so, after contacting Carolyn Greene ("Greene"), Vice President Employee Relations AXA Equitable, and receiving instructions from Greene to determine the nature of Glaspie's allegations, Bingham-Nelson met with Glaspie in person.[4]  (Greene Dep. at 27-28, Defs.' Mot. for Summ. J., Ex. 12.)  When she met with Glaspie, Bingham-Nelson listened to his concerns and wrote down the complaints he had with Defendants.  One of his complaints centered around events that he alleged occurred during a Great Lakes Branch-sponsored trip to a resort in Cancun, Mexico in January, 2006.  Glaspie alleged that another AXA employee, Plaintiff, approached him after dinner on January 26, 2006, suddenly grabbed his testicles and twisted them to the point where Glaspie almost blacked out.

## 2. Greene Takes Over the Investigation

After Bingham-Nelson met with Glaspie, she informed Greene of the complaints and Greene then took over the investigation.  (Bingham Dep. at 126; Greene Dep. at 31.)  Greene first spoke with Glaspie over the phone.  (Greene Dep. at 32.)  During this conversation, they discussed all of Glaspie's complaints.  (*Id.*)  Also during their discussion, Greene learned that Glaspie had already spoken with two AXA associates, Darlene

---

annuities.  Glaspie's district manager was Jeremy Goldstein.  His branch manager was Mackie.

[4]During the investigation, Greene was the Vice President Employee Relations AXA Equitable Insurance Company.  Her responsibilities as Vice President included providing advice and support to the sales organizations, including advice and support of employment issues, policies and procedures, and conducting investigations.

Frederick ("Frederick") and Keith Hullum ("Hullum"), regarding the allegations against Plaintiff.[5]  (*Id.* at 33.)

Greene then enlisted the assistance of Anna Pintsov, an employee relations specialist; together they formed an investigation plan.[6]  (*Id.* at 34-35.)  They decided to first address the testicle-grabbing allegation, since it concerned allegations of misconduct and were of an egregious nature.[7]  (*Id.* at 38.)  They made plans to interview Plaintiff, Glaspie, and others who may have had information regarding the allegation.

### 3. Greene Interviews Plaintiff's Supervisors

On February 23, 2006, Greene and Pintsov traveled to Defendants' Troy, Michigan office to interview people who may have had information regarding Glaspie's allegation against Plaintiff.  They first interviewed the Troy, Michigan AXA Branch Manager, Timothy

---

[5]Frederick is a Financial Professional with AXA Equitable.  She started on April 1, 2003.  She works at the Grand Rapids office of the Great Lakes Branch.  (Frederick Dep. at 8.)

Hullum is a Financial Advisor who has been working with AXA since 2004.  His district manager is Jim McDonald and he works in the Bingham Farms office.  (Hullum Dep. at 12.)

[6]In 2005, Pintsov began work for AXA Equitable as an employee relations specialist.  In this role, Pintsov conducted investigations into AXA policy violations by employees.

Greene requested Pintsov's help because Greene felt she needed help in the investigation and felt that Pintsov, fairly new to the employee relations team, would gain necessary experience with the investigation process.  (Green Dep. at 34-35.)

[7]Glaspie made other complaints against AXA, including a complaint relating to commission splitting.  Greene referred this investigation to the business and compliance unit.  (Greene Dep. at 38.)  Glaspie also made allegations relating to an EEOC claim, disability, and allegations that AXA treated African-American employees in the Downtown Detroit office differently than Non-African-American employees in that office.  (*Id.* at 51.)  Glaspie also alleged that Mackie inappropriately referred to African-Americans in his office as "boys," with a racial connotation.  (*Id.* at 54-55.)

Mackie.[8]  (*Id.* at 47.)  Although Mackie did not attend the Cancun trip, Greene thought he

may have had information regarding the allegations, based simply on his status as Branch

Manager.  (*Id.*)  Greene remembers that Mackie told her that he had not received any

reports about what happened between Plaintiff and Glaspie on the Cancun trip.  (*Id.* at 54.)

On either the same day, or a day later, Greene and Pintsov interviewed Rick Audas,

another Branch Manager.  (*Id.* at 57.)  From him, they received information that he did not

personally see or receive information of Plaintiff acting inappropriately during the Cancun

trip.  (*Id.*)

### 4. Greene Interviews Glaspie and Learns About the Cancun Trip

On February 24, 2006, Greene and Pintsov interviewed Glaspie, Plaintiff, and

Hullum in person, and Greene interviewed Frederick by phone.  (*Id.* at 66.)  When Greene

and Pintsov met with Glaspie, he discussed his allegations against Plaintiff.  (*Id.* at 69.)

Greene, explaining her notes from Glaspie's interview, remembers Glaspie's version of

what happened during the Cancun trip.  (*Id.* at 69-70.)  Greene remembers that Glaspie

informed her that on the night of the Cancun dinner Plaintiff, staggering as he walked,

slurring his speech, drunk out of his mind, approached Glaspie in the lobby and punched

and grabbed Glaspie's testicles.  Glaspie related to Greene how he bent over in pain and

screamed out and then how Plaintiff grabbed the back of Glaspie's shirt and pulled, choking

---

[8]During the discussion with Mackie, Greene and Mackie discussed an allegation made by Becky Friedman against Byron Glaspie.  (Greene Dep. at 52.)  Friedman alleged that Glaspie punched her.  (*Id.* at 53.)  Glaspie denied the punching.  (Greene Dep. at 53.)  Ultimately, Friedman admitted that she was mistaken and the allegation against Glaspie had no merit.

Glaspie.  (*Id.* at 70, 74.)  Greene remembers that Glaspie said that the reason for the whole

event was a joke gone wrong.  (*Id.* at 72.)  At the end of the interview, despite the fact that

there were no eye-witnesses or video recordings of the event, Greene found Glaspie's

version of events credible.  (*Id.*)

After Plaintiff allegedly grabbed Glaspie, Greene remembers that Glaspie told her

that Plaintiff attempted to talk to him while Glapie was bent over in excruciating pain.  (*Id.*

at 75.)[9]

As Greene and Glaspie continued their discussion, Greene asked Glaspie to sign

a medical release form, which he never signed or returned.  (*Id.* at 87.)  Although Greene

stated that medical information could have corroborated Glaspie's story, she was not

particularly concerned with not receiving medical proof.  (*Id.*)  She stated that she was not

---

[9]At Greene's deposition, Plaintiff's counsel confronted Greene with information that
could have had an effect on Glaspie's credibility regarding the incident that occurred after
the alleged testicle grabbing–Glaspie and Plaintiff's versions of the events that occurred
on the couch differed regarding the conversation's length and topics. (Greene Dep. at 76.)
Plaintiff's counsel confronted Greene with Glaspie's deposition, in which he said that he sat
on the couch for thirty minutes after the alleged testicle-grabbing incident. (*Id.*)  Greene
related that, if she had received this information, it would have been a factor in assessing
Glaspie's credibility and that she would have taken this bit of information into consideration
along with the other information in making her assessment of the investigation. (*Id.* at 76-
77.)

Plaintiff also offers the affidavit of Jeffrey Light ("Light") as an inconsistency in Glaspie's
story.  Light states that he was an AXA employee and attended the Cancun trip in 2006.
He also states that Glaspie never told him about the testicle-grabbing allegation. He also
relates a conversation that took place between Plaintiff, Glaspie, and himself the day after
the alleged grabbing.  In this conversation, Lights states that Glaspie never asked Plaintiff
for an apology and was generally friendly with Light and Plaintiff. (Light Aff., Pl.'s Resp., Ex.
68.)

Glaspie stated that he had a one-sided conversation with Plaintiff the day after the incident.
(Glaspie Dep. at 65.)

concerned because she was investigating the improper conduct and not the result of the conduct. (*Id.*)

     **5.    Greene Interviews Frederick and Hullum and Learns of New Misconduct Allegations Against Plaintiff**

At some time on that day, Greene contacted Frederick based upon Greene's previous conversation with Glaspie, in which she learned that Frederick might have information relating to the incident. (*Id.* at 100.) When Greene spoke with Frederick, she learned that Glaspie told Frederick about the testicle-grabbing incident, although Frederick did not see the event first-hand.[10] (*Id.* at 103.) Greene also learned of new issues relating to Plaintiff's conduct before and during the Cancun trip while talking to Frederick. (*Id.*)

Greene learned from Frederick that Plaintiff was drunk the evening of January 26, 2006, and that he made inappropriate comments toward her and her guest.[11] (*Id.* at 104.) Some of these inappropriate comments touched upon Frederick's looks and a request that Plaintiff could 'hit on' Frederick. (*Id.*) Greene also stated that Frederick told her that Plaintiff made offensive comments to her and her guest.[12] (*Id.* at 105.) Frederick also told

---

[10]Frederick saw Glaspie playing volleyball the day after the alleged incident. (Frederick Dep. at 36, Defs.' Mot. for Summ. J., Ex. 23.) Sometime near in time to the volleyball game, Frederick, Glaspie, and others were sitting at the pool when Glaspie related the testicle grabbing incident. (*Id.* at 36.)

[11]Frederick stated that Plaintiff had made comments towards her and other women that made her uncomfortable at the pools. (Frederick Dep. at 23.) She thought that Plaintiff was intoxicated. (*Id.*)

[12]Greene stated that these comments were a violation of the professionalism in the workplace policy and were offenses that constituted discharge. (Greene Dep. at 105.)

Greene that Plaintiff apologized for his behavior the day after the dinner.[13] (*Id.* at 108.) Frederick also related to Greene how Plaintiff's behavior to her at the Cancun trip was not an isolated event–Plaintiff had made her uncomfortable at work by repeatedly asking her out to lunch, stating that he wanted to be her friend, and stating that he wanted to find out what made her 'tick.' (*Id.* at 110-12.) Frederick related that Plaintiff called her one day and said something to the effect: "If I just breathe heavily into the phone, will you know it's me?"[14] (*Id.* at 116.) Frederick also told Greene that Plaintiff wished that Frederick would just go out for drinks, and were she to do so, she would see him in a different light. (*Id.* at 117.) Greene found Plaintiff's comments inappropriate. (*Id.* at 116-17.)

Greene also met with Hullum on February 24, 2006. (*Id.* at 126.) Although Hullum was not present in Cancun, Greene remembers that Hullum told her that he had spoken with Glaspie about the alleged assault. (*Id.* at 127-28.) Greene stated that she remembers, and her notes from the interview reflect, that Hullum also told her that he heard from Frederick that an AXA administrative assistant quit due to Plaintiff's sexual comments and aggressive behavior towards her.[15] (*Id.* at 131.)

---

[13]Frederick related that Plaintiff apologized to her the day after the Cancun dinner, although he did not give a specific reason why he thought he needed to apologize. (Frederick Dep. at 59.)

[14]Frederick stated that Plaintiff called her and asked her if she could identify who he was if he just breathed heavily into the phone. (Frederick Dep. at 17, Defs.' Mot. for Summ. J., Ex. 23.) Frederick also stated that Plaintiff asked her to go out with him and that he made her uncomfortable. (*Id.* at 15.) Plaintiff asked Frederick to go out and get to know him. (*Id.* at 16.)

[15]Hullum, during his deposition, remembers next to nothing and considered the deposition harassing and had no interest in the deposition. (Hullum Dep., Defs.' Mot. for Summ. J., Ex. 22.)

### 6.    Greene Interviews Plaintiff

Greene interviewed Plaintiff on that day as well.  Before Greene told Plaintiff of Glaspie's allegations, she listened to his version of what happened with Glaspie on January 26, 2006.  (*Id.* at 138-39.)  Greene remembers that Plaintiff recounted to her that the only interaction with Glaspie took place while Glaspie was seated on a low coffee table and Plaintiff was on a couch.  (*Id.* at 138-9)  Plaintiff also stated to Greene that his wife observed the conversation.[16]  (*Id.* at 138.)  During the conversation, Plaintiff related that he and Glaspie talked about another AXA employee's movement into a management position, which upset Glaspie.  (*Id.*)  Greene states that Plaintiff relayed to Greene that he told Glaspie to recruit, stand up, and be a man.  (*Id.*)  Plaintiff told Greene that he may have slapped Glaspie on the knee and may have hit him on the shoulder.  (*Id.* at 138-39.)

When Greene told Plaintiff of Glaspie's allegations, he denied them.  (*Id.* at 141.) Plaintiff told Greene that he thought Glaspie made up the allegation because Glaspie was angry at the branch and company.  (*Id.* at 141.)

During the interview, Greene stated that Plaintiff informed her that he had more than one drink on the afternoon of January 26, 2006, but that he did not have any drinks at dinner.  (*Id.* at 132.)  Plaintiff also told Greene that he put his hand on John Mousel's wife's shoulder.[17]  (*Id.* at 133.)  Later in the interview, Greene remembers that Plaintiff admitted

---

[16]Plaintiff's wife, Susan Sanford, submitted an affidavit stating that she observed a conversation between her husband and Glaspie on the night of the alleged testicle-grabbing incident.  She states that she observed the two of them in a casual conversation, Glaspie did not appear in any pain, she did not see Glaspie leaning over any chair, and she did not hear Glaspie scream out in pain.  (Susan Sanford Aff., Pl.'s Resp., Ex. 63.)

[17]Greene stated that she viewed touching someone's arm could be inappropriate conduct, depending upon where and how the person touches the other person.  (Greene

to having a lot to drink.  (*Id.* at 145.)  Greene also remembers that Plaintiff admitted that he was a touchy person.  (*Id.* at 248.)

### 7.    Greene Receives a Phone Call from Frederick and Interviews Mousel

Several weeks after  Frederick's initial telephone conversation with Greene, on March 9, 2010, Frederick called Greene again.  (*Id.* at 123.)  Greene remembers that Frederick told her that she was concerned that Plaintiff was going to be working full time in the Grand Rapids office (where Frederick was located) and that Plaintiff had tried to schedule a lunch with Frederick several times.  (*Id.* at 123-34.)

After her conversation with Frederick on March 9, 2010, Greene interviewed John Mousel, another registered representative with AXA Advisors who also attended the Cancun trip.[18]  (*Id.* at 300.)  Greene related that Mousel told her that Plaintiff was "sassy, sarcastic, aggressive, [and] drinking by the pool" during the Cancun trip (*Id.*)  Greene also recounts that Mousel said he was trying to avoid Plaintiff by the time of the reception since he expected Plaintiff to act inappropriately.  (*Id.*)  Greene remembers that Mousel stated that Plaintiff told Mousel's wife to leave Mousel and that he touched Mousel's wife and made inappropriate comments to others.  (*Id.* at 300-02.)  One of these inappropriate comments Greene received information about was Plaintiff's ridiculing and embarrassing

_____

Dep. at 133-34.)

[18]John Mousel worked as a registered representative for AXA Advisors, LLC at the Grand Rapids office from September 1, 2001, until October 30, 2009.  (Mousel Dep. at 9, Defs.' Mot. for Summ. J., Ex. 25.)

a male AXA employee and his male guest.[19]  (*Id*. at 149, 164.)  The allegation was that Plaintiff was questioning the AXA employee's sexuality.  Greene remembers Mousel reporting that he heard Plaintiff asking this employee why he did not bring a woman on the trip, and insinuating that something of a sexual nature was going on between the two men.  (*Id*. at 165.)  Plaintiff stated that he did make these comments to Nazoyan, but he did not remember whether he made the comments before or during dinner.  (Sanford Dep. at 131-33.)  He does not remember apologizing for the comments he made.  (*Id*. at 134.)

Greene also stated that Mousel may have told her, during the investigation, that Plaintiff put his hand inappropriately on Mousel's wife's shoulder.[20]  (Greene Dep. at 167.)

_____

[19]This incident involved Steve Nazoyan ("Nazoyan").  In January, 2006, Nazoyan was a Financial Professional with AXA.  (Nazoyan Dep. at 6, Defs.' Mot. for Summ. J., Ex. 26.)  Nazoyan also attended the Cancun rewards trip in January, 2006.  (*Id*.)  He brought a male guest with him, a long-time friend.  (*Id*. at 7.)  On January 26, 2006, he remembers hanging out at the pool and swimming and then having drinks at dinner that night.  (*Id*. at 8.)  At dinner, Nazoyan sat with his male friend, Paul Skoczylas and his wife, and John Mousel and his wife.  (*Id*. at 10.)  Plaintiff was not at their table.  (*Id*.)  Sometime during the dinner, Plaintiff came over to Nazoyan's table and starting making comments about Nazoyan and his friend.  (*Id*. at 11.)  Nazoyan stated that Plaintiff was intoxicated when he visited the table.  (*Id*. at 12.)  Plaintiff was "loud," "boisterous," "obnoxious," "swaying" and imparted on Nazoyan the impression that Plaintiff was intoxicated.  (*Id*. at 12.)  These comments suggested that Nazoyan and his friend were a homosexual couple and on a date.  (*Id*. at 11.)  Plaintiff continued prodding Nazoyan by asking if Nazoyan and his friend were staying in one room and whether they had a king bed or twin beds.  (*Id*.)  Although Nazoyan and Plaintiff had formerly had a teasing relationship, Nazoyan stated that he thought Plaintiff's comments crossed the line and were not funny.  (*Id*. at 12, 33.)  Nazoyan mostly ignored Plaintiff, but when Plaintiff did not stop, Nazoyan turned around.  (*Id*.)

No AXA investigator approached Nazoyan about this episode until the filling of this lawsuit.  *Id*. at 20.  Nazoyan did not report Plaintiff's Cancun conduct.  (*Id*. at 24.)  Nazoyan did not make a report, but he believed Plaintiff "harassed" him and that that harassment was "sexual [in] nature."  (*Id*. at 27.)

[20]Mousel remembers having a discussion with someone from AXA, although he does not remember whether that person was Greene.  (Mousel Dep. at 37, Defs.' Mot. for Summ. J., Ex. 25)  Mousel stated that, although he remembers next to nothing about

Greene does not precisely remember whose wife it was, but she assumed it was Mousel's. (*Id.* at 167-68.)

## C. The Investigation's Results

Greene stated that she found Plaintiff's inconsistent statements regarding his intoxication levels and her interviews of Frederick, Mousel, and Hullum led her to believe, based on the totality of the circumstances, that Glaspie's story was more believable than Plaintiff's. (*Id.* at 146-49.) Greene found that Plaintiff violated the harassment policy, the sexual harassment policy, and the professionalism in the workplace policy during the Cancun event. (*Id.* at 256.) She stated specifically that the conduct towards Frederick, John Mousel's wife, Nazoyan, and Glaspie violated the policies.[21] (*Id.* at 268-70, 272.)

Greene stated that she formed the opinion at the end of her investigation that Glaspie's allegation against Plaintiff was credible. (*Id.* at 375.) Greene also stated that she had a reasonable belief that Plaintiff violated AXA's policies on misconduct, harassment, sexual harassment, and the standards for professional conduct. (*Id.*) In forming her

_____

Plaintiff and the Cancun trip, he does remember that his wife felt that the interaction with Plaintiff was uncomfortable. (*Id.* at 71.)

Plaintiff does remember touching Mousel's wife on the shoulder when they were introduced to each other, but he believes that the introduction occurred at the pool during the afternoon of the dinner party. (*Id.* at 134-35.)

[21]Pintsov ultimately came to the same conclusion as Greene–she believed that Plaintiff violated AXA's policies on harassment and misconduct and she and Greene recommended his termination. (*Id.* at 193, 199.) She found the witness statements credible. (Pintsov Dep. at 39.) She also confirmed AXA's policy of interviewing only AXA employees. (*Id.* at 84.) Her recollection of the Cancun event tracked Greene's. For example: no one reported Plaintiff's actions to Audas, but Audas did state to Pintsov that Plaintiff and his wife had too much to drink (*Id.* at 151); Plaintiff did tell Pintsov that he teased Nazoyan (*Id.* at 170); Plaintiff told Pintsov that he was a touchy person (*Id.*); and Pintsov did not interview Frederick (*Id.* at 181-84).

opinion, she considered the allegations, statements, prior and past history for the same conduct, and the totality of the circumstances.  (*Id.* at 376.)  She stated that her decisions to recommend Plaintiff's termination was consistent with Defendants' policies. (*Id.* at 378.)

Greene informed Plaintiff of the investigation results on March 15, 2006.  (*Id.* at 229.)  During that conversation, Greene told Plaintiff that he was not to come into any of the offices until further notice and that he would be paid during the investigatory suspension. (*Id.* at 326.)

### D.  Plaintiff's Version of Events

Plaintiff recounts the day of the alleged testicle-grabbing differently than Glaspie and the others do.  Plaintiff remembers arriving at the resort and having a drink immediately upon arrival.  (Sanford Dep. at 121.)  He remembers sharing a bottle of wine at lunch and then spending the afternoon with his wife at the pool.  (*Id.* at 122.)  He stated that he drank at the pool, but does not remember how many drinks he had.  (*Id.* at 123.)

By the time dinner came around, he acknowledged that drinks were on demand, but he does not remember if he drank at dinner.  (*Id.* at 127-28.)  Plaintiff does not recall having any conversations during dinner.  (*Id.* at 134.)  Nor does he remember continuing to drink throughout dinner.  (*Id.*)  He does not remember speaking to Frederick or her guest at the dinner.  (*Id.*)

Plaintiff's first memory of seeing Glaspie during the trip was at the dinner on January 26, 2006.  (*Id.* at 144.)  Plaintiff states that he probably said hello to Glaspie at the dinner, but had no other interaction with him at the dinner.  (*Id.* at 145.)  After dinner, Plaintiff related that he had a conversation with Glaspie.  (*Id.* at 146.)  Plaintiff stated that the conversation touched upon Glaspie's anger at being removed from the company's

management development program and replaced by a more experienced manager. (*Id.*) Plaintiff stated that he told Glaspie to "stop crying in [his] beer" and start going out and recruiting so that he can remain in management. (*Id.*) Plaintiff did not recall whether Glaspie responded to these statements. (*Id.* at 147.) Plaintiff stated that the only physical contact he had with Glaspie was when Plaintiff "might have touched his knee [or] might have patted him on the back when [Plaintiff] was walking away[.]" (*Id.*) Plaintiff related that he could not have done anything that Glaspie would have perceived as unwanted contact. (*Id.*)

After spending time in the lounge with his wife, Plaintiff approached Frederick and her guest. (*Id.* at 137-38.) He sat down at the table and had a conversation with Frederick's guest regarding her holding herself out as a psychic. (*Id.* at 138.) He stated he may have purchased their drinks for them, but he did not remember. (*Id.*) The day after the Cancun dinner, Plaintiff apologized to Frederick, but stated that "[the apology] was rather sarcastic." (*Id.* at 140.) He meant he was angry with her for being unwelcoming to him when he joined the Grand Rapids office. (*Id.*)

During the trip, Plaintiff made a comment to Nazoyan regarding Nazoyan's male guest, stating that the guest may have been Nazoyan's date, insinuating that the two of them were a homosexual couple. (*Id.* at 131-32.) Plaintiff could not remember whether the exchange took place during dinner or before at the pool. (*Id.* at 133.) Plaintiff did not remember apologizing for the comment. (*Id.* at 134.)

Sometime during the trip, he touched Mousel's wife's shoulder when he was introduced to her, but he believes that occurred at the pool. (*Id.* at 135.) He does not remember touching any other women at the dinner. (*Id.* at 134-35.)

He did not remember commenting on any woman's appearance at the pool or at dinner.  (*Id.* at 135.)

In sum, Plaintiff was not aware of anyone telling him that he had had too much to drink or attempting to stop him from drinking. (*Id.* at 136.)

E.    **Termination Recommendation and Proceedings**

Greene and Pintsov informed Schulman, Senior Vice President in Human Resources for AXA Equitable, of their investigations and findings. (Schulman Dep. at 8, 11, Defs.' Mot. for Summ. J., Ex. 29.)  Schulman did not take part in Plaintiff's investigation.  (*Id.* at 9.) Schulman remembers that Greene and Pintsov told him of the Glaspie allegation, but he does not remember if they told him about any other investigations relating to other employees stemming from the Cancun trip.  (*Id.* at 14.)  At the end of their meeting with Schulman, Greene and Pintsov recommended terminating Plaintiff.  (*Id.* at 18.)  Schulman remembers that Greene and Pintsov recommended terminating Plaintiff based upon "the merits of the witnesses . . . [and the] corroboration of the allegations that had been made." (*Id.*)

After the meeting, Schulman passed along the termination recommendation to the decision makers–Ben Hudson, the Detroit Branch Manager, and Staley Gentry, the Midwestern Divisional President.[22]  (*Id.* at 19.)  Schulman advised Hudson and Gentry that he agreed with the recommendation.[23]  (*Id.* at 20.)

_____

[22]Gentry was the AXA Regional and Divisional President from 2001 to 2007.  (Gentry Dep. at 7, Defs.' Mot. for Summ. J., Ex 30.)

[23]In March, 2006, Gentry first became aware of allegations against Plaintiff when Bingham-Nelson informed him of those allegations.  (*Id.* at 10.)  Bingham-Nelson told Gentry that she was beginning an investigation into "bizarre allegations" made against

After Greene recommended termination, Gentry decided to terminate Plaintiff and he began the termination process. (*Id.* at 21, 28.) Gentry called Plaintiff's supervisor, Hudson, and told him that he needed to terminate Plaintiff. (*Id.* at 21-22, 38.) In deciding to terminate Plaintiff, Gentry "relied heavily on [Greene's] expertise and professionalism," stating "[s]he was very good at what she did." (*Id.* at 46.) Gentry also honestly and reasonably believed that Plaintiff violated Defendants' policies. (*Id.* at 46-47.) Gentry did not participate in Plaintiff's termination, nor did he have any input in drafting Plaintiff's termination letter. (*Id.* at 42-43.)

Hudson spoke with Greene about Plaintiff and his termination, although he does not remember whether the two of them reviewed any allegation against Plaintiff. (Hudson Dep. at 20, Defs.' Mot. for Summ. J., Ex. 6.) Hudson remembers that Greene did inform him that Schulman and Gentry recommended terminating Plaintiff. (*Id.* at 21.) Hudson stated, though, that the 'home office' instructed him to terminate Plaintiff. (*Id.* at 24.)

---

Plaintiff concerning the Cancun trip. (*Id.* at 15.) But Bingham-Nelson did not tell Gentry the "bizarre allegation" specifics. (*Id.* at 17.) Gentry did not play a role in the investigation. (*Id.* at 18.) He did help facilitate Greene's interviews by calling Hudson and instructing him to help Greene set up the interviews. (*Id.* at 50.) Eight to twelve weeks after Greene's initial contact with him, Greene informed Gentry that she had concluded Plaintiff's investigation and recommended terminating Plaintiff. (*Id.* at 19.) Greene did not tell Gentry the investigation details; she simply told him that Plaintiff violated professionalism and harassment policies. (*Id.* at 21, 36.) Gentry would not normally have access to the investigation details, since the investigation was a private issue. (*Id.* at 24.) Gentry stated that the standard termination policy and procedure after an investigation was to take the investigation findings and recommendation and carry out that recommendation. (*Id.* at 30.) He had no role in conducting the investigation and had no duty to find that the human resources department inappropriately conducted the investigation. *Id.* Although Gentry took the recommendation and carried it out, he still had the discretion to not terminate Plaintiff, but decided to terminate him based upon "the thorough investigation." (*Id.* at 32.) Gentry stated that he believed the investigation was thorough since he had been with AXA for 30 years and "had not seen a mistake during that period." (*Id.*)

Before terminating Plaintiff, Hudson waited for instruction from the home office before he took further steps in terminating Plaintiff.[24]  (*Id.* at 27.)  The instruction he received was a list of "talking points" of what to say in the termination conversation.  (*Id.*)  This "talking points" document included the following reasons for termination:

> The investigation found that you engaged in inappropriate unprofessional conduct in Cancun, including grabbing and twisting [Glaspie's] testicles, choking him, making inappropriate comments to male associates about their sexual orientation, and making inappropriate comments of a sexual nature to females.  Your conduct violated [AXA's] policies regarding Professionalism in the Workplace, Harassment, and Gross Misconduct.

(Defs.' Mot. for Summ. J., Ex. 31.)

On March 21, 2006, Plaintiff met with Hudson.  (Sanford Dep. at 192.)  At the meeting, Hudson terminated Plaintiff's contracts because of the results from the investigation, specifically, the events that occurred in Cancun.  (*Id.* at 192-93.)  Hudson directly read the "talking points" document to Plaintiff.   (Pl.'s Resp., Ex. 66.)

Also during the termination meeting, Plaintiff and Hudson discussed Plaintiff's Form U5.[25]  (Sanford Dep. at 204.)  Plaintiff worried about the U5's language, stating that "if the language [of the U5] is inexact one could have a real difficult time getting employing in the financial services industry." (*Id.*)  Plaintiff's U5 stated that Defendants terminated him for "violations of noninvestment-related company policies."  (*Id.* at 205.)

---

[24]Hudson had  used the same procedure in terminating people before. (Hudson Dep. at 30.)  Defendants' policy is that someone in Hudson's position would not investigate any harassment or misconduct.  (*Id.* at 34.)  The policy is that the home office would do the investigating.  (*Id.*)

[25]A U5 is a Financial Industry Regulatory Authority ("FINRA") form that a broker-dealer such as AXA Advisors must fill out when it terminates a registration.  (Defs.' Mot. for Summ. J. at 26.)

### F.    Plaintiff's Subsequent Employment

Plaintiff states that the U5's language prevented him from getting work for six months.  (*Id.* at 205.)  Plaintiff stated that he would have preferred no language on the U5 concerning his termination.  (*Id.*)  Plaintiff formed the opinion that the U5 prevented him from getting a job based upon conversations he had with Douglas Barrier ("Barrier"), a New York Life employee, in which Barrier stated that Plaintiff's qualifications made Plaintiff a desirable candidate but no company was going to hire Plaintiff unless the U5's language was clearer.  (*Id.* at  252-53.)  Plaintiff stated that the U5 and his description of the assault did not satisfy his potential employers' requirements and that they required additional documentation.  (*Id.* at 44-45.)

In late August, or early September, 2006, Plaintiff received a job offer from VantagePointe Financial Group, a member of the John Hancock Financial Network ("John Hancock").  (Sanford Dep. at 26.)  David Pasciak ("Pasciak"), then an agency manager at John Hancock, hired Plaintiff.[26]

Pasciak met Plaintiff sometime in the first four months of 2006.  (*Id.* at 12.)  The two met for coffee or breakfast.  (*Id.*)  Pasciak did not express any concerns about Plaintiff's termination from AXA.  (*Id.* at 16.)   Pasciak personally did not request any extra documentation from Plaintiff, although the corporate offices may have.  (*Id.* at 18.)

Pasciak stated that the John Hancock corporate office would have conducted a background check on any potential employee.  (*Id.* at 18.)   But Pasciak did not recall the

---

[26]Since 1980, David Pasciak has worked at John Hancock.  (Pasciak Dep. at 9, Defs.' Mot. for Summ. J., Ex. 33.) In January, 2009,  Pasciak became president of the company. *Id.*  In 2006, he was an agency manager.  (*Id.* at 10.)

average length of time that the corporate office took to investigate someone's background. (*Id.* at 19.) But he did know that the background check usually included a check for criminal convictions, a driver's license check, as well as a U5 check. (*Id.* at 19.)

Regarding Plaintiff, Pasciak does not remember ever seeing Plaintiff's U5. (*Id.* at 20.) During the hiring process, the corporate office did have a question about Plaintiff's U5 termination reason. (*Id.* at 22.) Pasciak eventually asked Plaintiff about the termination and Plaintiff told Pasciak that Defendants terminated him because he was alleged to have touched an employee in the groin area. (*Id.* at 23.) Plaintiff's account made Pasciak do a little digging about Plaintiff before he would hire him. (*Id.* at 24.) Pasciak spoke with several members of AXA about Plaintiff, although Pasciak can only identify Jeff Light by name. (*Id.* at 24-25.) These members related a story similar to Glaspie's version of what happened in Cancun. (*Id.* at 25.) Even with this story, Pasciak made the decision that Plaintiff "was somebody who[m] [he] wanted on [his] team." (*Id.* at 27-28.) After "reflection," Pasciak decided to hire Plaintiff because Pasciak trusted Jeff Light, who recommended Plaintiff. (*Id.*) After Pasciak decided to hire Plaintiff, corporate approval took a couple of days, and about 24 hours after Pasciak received approval, he hired Plaintiff. (*Id.* at 29.)

### G.    Replacement

In 2006, Plaintiff was a district manager of the Saginaw branch. (Hudson Dep. at 14.) At his termination, Plaintiff was not officially the district manager in Grand Rapids, although he was performing that district manager's responsibilities. (*Id.* at 15.)

Karen Lawrence-Webster, an African American woman, is the current district manager in Saginaw. (Mackie Dep. at 81, Defs.' Mot. for Summ. J., Ex. 4.) In June, 2009,

she became the district manager. (*Id.* at 81.) But after Defendants terminated Plaintiff, no one took over his duties. (*Id.* at 81.)

### H. Plaintiff's Former Action Against AXA Equitable

On June 15, 2006, almost four months after his termination, Plaintiff filed a complaint in Saginaw County Court against AXA Equitable. (Defs.' Mot. for Summ. J., Ex. 34.) In his complaint, Plaintiff alleged AXA Equitable violated the Bullard-Plawecki Employee Right to Know Act, Mich. Comp. Laws § 423.501 *et seq*, by not providing a complete copy of his personnel records. (*Id.*) Plaintiff was attempting to get his personnel file that contained an investigation report that detailed the reason behind Defendant's termination of Plaintiff. (*Id.*) Specifically, the "Background" section of the complaint states:

- [Plaintiff] was employed by AXA [Equitable.]

- [Plaintiff] was terminated as an employee by AXA [Equitable.]

- Both the Termination Letter and the "Termination-Resignation and NTO" cover page provided by AXA [Equitable]. . . indicate that the termination was "for cause."

- [Plaintiff] was told verbally that the reason for his termination was a formal investigation report carried out by AXA [Equitable.]

(*Id.*) On October 13, 2006, the Saginaw Circuit Court ordered AXA Equitable to "turn over all materials and documents in any way responsive to the subject matter of this case[.]" (Saginaw Circuit Court October 13, 2006 Order, Defs.' Mot. for Summ. J., Ex 35.) On October 6, 2008, the Saginaw Circuit Court dismissed Plaintiff's action against AXA Equitable with prejudice pursuant to a stipulation of dismissal. (Saginaw Circuit Court October 6, 2008 Order, Defs.' Mot. for Summ. J., Ex. 37.) On March 12, 2009, Plaintiff filed suit again against AXA Equitable in Saginaw Circuit Court. (Dkt. No. 1.) On June 5, 2009,

AXA Equitable removed the action to this Court.  (*Id.*)  Three months later, on August 3, 2009, the Plaintiff and AXA stipulated to add AXA Advisors, LLC, and AXA Network, LLC. (Dkt. No. 10.)  The Court approved this stipulation.  (Dkt. No. 11.)  Plaintiff filed an amended complaint and Defendants answered the amended complaint.  (Dkt. Nos. 14, 15.) Defendants asserted, as one of their defenses, that the 2006 Saginaw Circuit Court action barred Plaintiff's claims in this Court.  (*Id.*)

## II.    Summary Judgment Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III.    Analysis

Plaintiff cannot survive Defendants' motion for summary judgment. Plaintiff first fails to persuade the Court why res judicata should not bar this case. Yet even if res judicata did not apply, Plaintiff has also failed to establish a prima facie case of reverse-race discrimination because he has not brought forth evidence that Defendants treated a similarly-situated non-Caucasian better than him or that a non-Caucasian replaced him in a discrimination context. Plaintiff further has failed to establish that Defendants terminated Plaintiff for discriminatory reasons and that their offered reasons are pretext for the discrimination. Regarding Plaintiff's breach of contract claim, he has not persuaded the Court that Defendants breached their contracts with him when they terminated his employment since he admittedly violated Defendants' policies in at least one respect. Finally, Plaintiff has failed to show that Defendants tortiously interfered with Plaintiff's business prospects since he has not brought forth evidence of a business expectancy in which he did not receive a job offer or proof of Defendants' malicious intent.

### A.    Res Judicata Bars Plaintiff's Claims

Defendants argue that res judicata bars Plaintiff's action; Defendants are correct since Plaintiff could have brought the current claims against Defendants in his former action against Defendant AXA Equitable in 2006. "When a federal court is asked to give preclusive effect to a state court judgment, the federal court must apply the law of the state in which the prior judgment was rendered in determining whether and to what extent the

prior judgment should be given preclusive effect in a federal action." *Corzin v. Fordu*, 201 F.3d 693, 703 (6th Cir. 1999.)  In Michigan, res judicata "bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. Michigan*, 680 N.W.2d 386, 396 (Mich. 2004) (citation omitted).  The Michigan Supreme Court applies res judicata "broadly," stating that res judicata "bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Id.* (Citation omitted.)

### 1.  Plaintiff's Former Suit Against AXA Equitable Was Decided On the Merits

On October 6, 2008, Plaintiff and Defendant AXA Equitable dismissed the former suit with prejudice.  A dismissal with prejudice is a decision on the merits.  *See Wilson v. Knight-Ridder Newspapers, Inc.*, 475 N.W.2d 388, 389 (Mich. Ct. App. 1991) (citations omitted) (stating "[t]he dismissal with prejudice of the [former] suit, which arose out of the same facts as the instant suit, amounted to an adjudication of the merits and bars [the present] action.")  *See also Limbach v. Oakland County Bd. of County Rd. Comm'rs*, 573 N.W.2d 336, 339 (Mich. Ct. App. 1997) *appeal den.* 593 N.W.2d 559 (Mich. 1999) (stating "a voluntary dismissal with prejudice acts as an adjudication on the merits for res judicata purposes.") (citation omitted).  Here then, Plaintiff's former action satisfies the first element of res judicata.

### 2.  The Current Defendants Are in Privity with Former Defendant AXA Equitable

Plaintiff's former action also satisfies the second element of res judicata, since former Defendant AXA Equitable is in privity with this action's Defendants. "To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert. *Adair*, 680 N.W.2d at 396 (citation omitted). "The outer limit of the doctrine traditionally requires both a substantial identity of interests and a working functional relationship in which the interests of the nonparty are presented and protected by the party in the litigation." *Id.* (Internal quotation marks and citation omitted.) "[A] perfect identity of the parties is not required, only a substantial identity of interests that are adequately presented and protected by the first litigant." *Id.* at 397.

Here, AXA Equitable, AXA Advisors, and AXA Network are in privity with each other. *See In re Vision Service Plan Litigation*, No. 09-1829, 2010 WL 2572076, at *9 (S.D. Ohio June 22, 2010) (holding that the legal interests of a company and subsidiary were aligned and the parties were in privity, noting that the company and subsidiaries shared the same legal counsel and retained the same experts) (also citing cases holding that privity existed between a parent company and subsidiary when they shared legal counsel and corporate officers). Greene and Pintsov conducted the investigation on behalf of all three entities. All three Defendants were involved in the termination decision– Schulman was the Senior Vice President in Human Resources for AXA Equitable, Gentry was the AXA Regional and Divisional President, and Hudson, Plaintiff supervisor at the Detroit branch also made the decision to terminate Plaintiff's contracts based upon the investigation's findings. Defendants' legal interests, counsel, and principal actors in Plaintiff's termination were aligned with former Defendant AXA Equitable's interests, counsel, and actors. The current

Defendants are therefore in privity with Defendant AXA Equitable from Plaintiff's previous suit.

### 3.   The Essential Facts Are the Same As the Former Action

Plaintiff's former action satisfies res judicata's third element.  Discussing the third element, the Michigan Supreme Court applies res judicata to bar "a subsequent action between the same parties when the evidence or essential facts are identical." *Adair*, 680 N.W.2d at 397.  The Michigan Supreme Court applies a broad transactional approach to bar claims.  "The transactional test provides that the assertion of different kinds of theories of relief still constitutes a single cause of action if a single group of operative facts give rise to the assertion of relief." *Id.* (Internal quotation marks and citation omitted.)  "Under this approach, a claim is viewed in factual terms and considered conterminous with the transaction, regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; *** and regardless of the variations in the evidence needed to support the theories or rights." *Id.* (Internal quotations marks and citation omitted.)  "The determinative question is whether the claims in the instant case arose as part of the same transaction as did the claims in [the former case.]" *Id.*  Although new evidence is a relevant factor, it is not determinative.  *Id.*  "Whether a factual grouping constitutes a transaction for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in *time, space, origin or motivation*, [and] whether they form a convenient trial unit." *Id.* (Citation omitted, alterations and insertions in original.)

Here, the claim in this case arose as a part of the same transaction as did the former state case–Plaintiff's termination.  Although Plaintiff argues that he could not have brought

this action without his termination file, he fails to persuade the Court with that argument. Hudson read the termination reasons and the "talking points" document to Plaintiff at the termination meeting. Plaintiff therefore knew that Defendants were terminating him based upon the investigation's conclusions–that he assaulted Glaspie, made inappropriate comments to Nazoyan, and acted inappropriately towards women. Plaintiff knew that these investigation conclusions violated company policies. He also had immediate concerns about his U5's language. At the filing of his state complaint, he should have known that he could have had an action for discrimination, breach of contract, and tortious interference. Plaintiff therefore has failed to show why this Court should not bar his claims because of res judicata.

**B.     Plaintiff's Reverse-Race Discrimination, Breach of Contract, and Tortious Interference Claims Fail**

Even if res judicata did not bar Plaintiff's claims, Plaintiff's claims would fail because he has not established a prima facie case of reverse-race discrimination under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), breach of employment contracts, or tortious interference with his business prospects.

**1.     Plaintiff Has Not Proven Reverse-Race Discrimination**

Defendants argue that summary judgment is appropriate as to Plaintiff's reverse-race discrimination claim under Michigan's ELCRA because Plaintiff has failed to: (1) provide evidence to demonstrate a prima facie case of reverse-race discrimination or (2)

raise genuine issues of material fact regarding whether Defendants' decision to terminate him was pretext for employment discrimination.[27]

There are two ways in which Plaintiff can prove his reverse-race discrimination claim.  Plaintiff can prove his claim using direct evidence of discrimination or circumstantial evidence.  Here, Plaintiff does not argue that any direct evidence of discrimination exists. ( Pl.'s Resp. to Defs.' Mot. for Summ. J. at 26.)  Plaintiff therefore must establish his discrimination claim using circumstantial evidence.  The Court analyzes circumstantial evidence discrimination claims using the three-part burden-shirting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  A plaintiff must first establish a prima facie case of discrimination.  *Roche*, 2009 WL 3854266, at *6 (citing *Clark v. Rock-Tenn Co.*, 304 F. App'x 399, 402 (6th Cir. 2008)).  If a plaintiff establishes a prima facie case, then the burden shifts to the employer to put forth a "legitimate, non-discriminatory reason for the challenged employment action."  *Id.* (Citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000.)  After the employer puts forth such a reason, the burden shifts back to the plaintiff to show that the "employer's proffered explanation is simply a pretext for unlawful discrimination."  *Id.* (Citation omitted.)

In the context of Plaintiff challenging his former employer's termination decision, this circuit's "honest belief" doctrine or Michigan's "business judgment" rule comes into play.

---

[27]Michigan's ELCRA prohibits employers from discriminating against employees on the basis of race.  Mich. Comp. Laws § 37.2202.  Courts analyze ELCRA discrimination claims under the same framework as federal law, and Michigan courts follow federal civil rights law to interpret them.  *Roche v. Checkers Drive-In Rest., Inc.*, No. 09-10023, 2009 WL 3854226, at *6 (E.D. Mich. Nov. 17, 2009) (citing *Jackson v. Quantex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) and *Sniecinski v. Blue Cross & Blue Shield Michigan*, 666 N.W.2d 186, 193, n.6 (Mich. 2003)).

These two principles require the Court to give deference to the employer's decision so long as the employer establishes its "reasonable reliance on the particularized facts that were before it at the time the decision was made." *See Escher v. BWXT Y-12 LLC*, - - - F.3d - - - -, 2010 WL 4024951, at *6 (6th Cir. Sept. 22, 2010) (holding "[i]n discrimination cases, this court has adopted a 'modified honest belief' rule which states that 'for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.'" (citation omitted)). Michigan courts follow this approach as well. *See Cooper v. Dept. of Corrections*, No. 292582, 2010 WL 4026423, at * (Mich. Ct. App. Oct. 14, 2010) (holding "the soundness of an employer's business judgment may not be questioned as a means of showing pretext." (Citing *Meagher v. Wayne State Univ.*, 565 N.W.2d 401 (1997)). *See also Swartz v. Berrien Springs Pub. Sch. Dist.*, No. 286285, 2009 WL 4163539, at *5 (Mich. Ct. App. Nov. 24, 2009) (holding "[a]n employer's honest belief in a proffered reason for a challenged employment decision will be upheld against a charge of pretext as long as the employer can identify particularlized facts for its honest belief." (citation omitted). But "summary judgment is not appropriate every time an employer offers [a] "business judgment" rationale. The distinction lies between a poor business decision and a reason manufactured to avoid liability. Thus, facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." *Hartsel v. Keys*, 87 F.3d 795, 800, 801 (6th Cir. 1996) (also stating "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not fire, hire, or promote for impermissible, discriminatory reasons.").

### a. Plaintiff Cannot Establish a Prima Facie Case of Discrimination

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he was qualified for his job and performed it satisfactorily; (2) despite his qualifications and performance, he suffered an adverse employment action; and (3) that he was either replaced by a person outside his protected class or was treated less favorably than a similarly situated individual outside his protected class. *Roche*, 2009 WL 3854266, at *7 (citing *Johnson*, 215 F.3d at 577).[28]

Neither party disputes that Plaintiff has satisfied the first two elements. For Plaintiff therefore to establish a prima face case of reverse-race discrimination he must demonstrate that he was treated differently than a similarly-situated Non-Caucasian who engaged in the same or similar conduct or that he was replaced by a Non-Caucasian. *Id.* at *7.

### i. Plaintiff Has Not Proven That Anyone Similarly Situated Was Treated Differently Than Him

To be deemed "similarly situated," Plaintiff must show that the "individuals with whom [Plaintiff] seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their

---

[28]Formerly, a plaintiff alleging an ELCRA reverse-race discrimination in Michigan had to prove background circumstances that supported the suspicion that the defendant was the unusual employer who discriminated against the majority. A plaintiff need no longer prove background circumstances. *See Leavey v. City of Detroit*, - - F.Supp.2d - -, 2010 WL 2539426, *11, n. 16 (E.D. Mich. June 24, 2010) (Tarnow, J.) (stating that a plaintiff alleging and ECLRA reserve race discrimination claim under Michigan law need no longer satisfy the former "background circumstances" prong of a reverse-race discrimination claim (citing *Lind v. City of Battle Creek*, 681 N.W.2d 334 (Mich. 2004)).

conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted). "Although Plaintiff need not demonstrate an exact correlation with the employee who allegedly received more favorable treatment, the employee with whom the plaintiff seeks to compare himself [] must be similar in all of the relevant aspects." *Roche*, 2009 WL 3854266, at *9 (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted)). *See also Town v. Michigan Bell Telephone Co.*, 568 N.W.2. 64, 70 (Mich. 1997) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)) (holding "[t]o create an inference of disparate treatment, [Plaintiff] must prove that he and [a Non-Caucasian] were similarly situated, [that is,] 'all of the relevant aspects' of his employment situation were 'nearly identical' to those of [the Non-Caucasian's] employment situation.") In personnel action contexts, "the relevant factors for determining whether employees are similarly situated often include the employees' supervisors, the standards that the employees had to meet, and the employees' conduct." *Johnson v. Kroger Co.*, 319 F.3d 858, 867 (6th Cir. 2003) (citation omitted).

Plaintiff offers Glaspie as someone similarly situated. Plaintiff argues that Glaspie was also accused of an assault, but that Glaspie did not lose his job over the accusation, he was only suspended. (Pl.'s Resp. at 27.) Although Plaintiff is correct that Glaspie was suspended and not terminated, Plaintiff overlooks the distinction between Glaspie's alleged assault and his own–Glaspie was misidentified as the person that committed the assault and then the allegations against him were dropped and he was no longer suspended. (Glaspie Dep. at 27.) Regarding Plaintiff, Glaspie accused Plaintiff of assault, Defendants conducted an investigation and found that Glaspie's story was credible, not to mention that

Defendants found a slew of other instances of Plaintiff's conduct that they found violated their sexual harassment and professionalism policies.

There also is not any evidence that anyone in a district manager position, such as Plaintiff, ever committed an alleged assault or engaged in such sexual or other harassing conduct as Plaintiff; he therefore cannot point to anyone similarly situated. (Greene Dep. at 379.)

### ii. Plaintiff Has Not Proven That Anyone of A Protected Class Replaced Him

"A person is replaced only when another employee is hired or reassigned to perform plaintiff's duties." *Lytle v. Malady*, 579 N.W.2d 906, 915, n. 27 (Mich. 1998) (citing *Barnes v. GenCorp. Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990), *cert. den.* 498 U.S. 878 (1990). *See Parries v. Makino, Inc.*, 148 F. App'x 291, 298 (6th Cir. 2005) (holding, in a race discrimination context that "[s]preading the former duties of a terminated employee among the remaining employees does not constitute replacement and . . . the question is whether the delayed promotion of [the plaintiff's claimed replacement] constituted replacement. (Internal quotation marks and citations omitted.)) The *Parries* court found that the district court did not err in finding the alleged-replacement person did not actually replace the plaintiff. *Id.* Since the person "took on many, but not all, of the plaintiff's duties without any initial change in position or employment status" and there was a "substantial delay" of eight to ten months between the person actually taking over the plaintiff's duties, the *Parries* court found that the person was not promoted to "replace" the plaintiff in a discrimination context. (*Id.*).

Here, Plaintiff alleges that Lawrence-Webster, an African American woman, replaced him as the Saginaw district manager. But Plaintiff's allegation is too tenuous to succeed. Defendants stated that, after they terminated Plaintiff, no one took over his duties. (Mackie Dep. at 81.) Over three years later, Lawrence-Webster became district manager of the Saginaw branch. (*Id.* at 81.) This three year time period is more than the substantial delay of eight to ten months that the *Parries* court found relevant in its replacement analysis. Even if the time delay alone were not enough, at his termination, Plaintiff was performing duties at both the Saginaw and Grand Rapids branches, and he has not made any allegations that Lawrence-Webster was hired to perform his duties at both branches. Plaintiff therefore has failed to prove that Defendants replaced him with a Non-Caucasian. Because Plaintiff has failed to establish the first element of a prima facie reverse race discrimination claim, he cannot survive Defendants' motion for summary judgment.

### 2. Defendants Have Articulated a Legitimate, Non-Discriminatory Reason for terminating Plaintiff

Defendants argue that, even if Plaintiff had established a prima-facie case of reverse-race discrimination, they would still be entitled to summary judgment because they have presented evidence of a legitimate, non-discriminatory reason for terminating Plaintiff and Plaintiff has not presented any evidence that such a reason was pretext for discrimination.

Here, Defendants found that Plaintiff violated company sexual harassment and misconduct policies. This finding is a sufficient reason for terminating an employee. *See Roche*, 2009 WL 3854266, at *10 (finding that termination for violating a corporate policy is a legitimate non-discriminatory reason).

### 3. Plaintiff Cannot Establish that Defendants' Proffered Termination Reason Was Pretext for Reverse-Race Discrimination

When a defendant puts forth a legitimate, non-discriminatory reason for terminating a plaintiff, the only way a plaintiff can survive summary judgment is to show that the reason was pretext for discrimination. A plaintiff can establish pretext either directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (internal quotation marks and citation omitted). To establish pretext, a plaintiff usually must show "that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *Id.* at 393 (citations omitted). But a plaintiff can also show pretext "by offering evidence [that] challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (Internal quotation marks and citations omitted.)

For Plaintiff to show that the termination had "no basis in fact" and thus was pretext, he must show that "the proffered bases for the plaintiff's discharge never happened, [that is], that they are factually false." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks and citation omitted) *(overruled on other grounds, Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009). To show that the termination reason was "not the actual reason," Plaintiff would have to show "circumstances [that] tend to prove than an illegal motivation was *more* likely than that offered by the defendant." *Id.* (Emphasis in original.) And finally, to show that a termination reason was "insufficient to

34

explain the employer's action," Plaintiff would have to show that "other employees . . . were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id.* The first and third pretextual showings are "direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis . . . to infer illegal discrimination from the plaintiff's prima facie case." *Id.* (Citation omitted.) Regarding the second method of pretext proof, Plaintiff cannot "rely simply upon his prima facie evidence but must, instead, introduce additional evidence of . . . discrimination." *Id. See DeBiasi v. Charter County of Wayne*, 537 F.Supp.2d 903 (E.D. Mich 2008) (Rosen, J.) (applying this framework to a reverse-race discrimination claim).

Plaintiff presents two pretext arguments. He first argues that the Glaspie incident did not happen, arguing the termination had no basis in fact. He then argues that the real reason he was terminated was to placate Glaspie, whom Plaintiff alleged was threatening to sue Defendants.

Here, Plaintiff fails to support his pretext allegations. He fails to do so, in part, because the Court must view the pretext allegations in the context of the "honest belief" or "business judgment" rule. If an employer has an "honest belief in a proffered reason for a [termination] [a court will uphold it] against a charge of pretext as long as the employer can identify particularized facts for its honest belief." *Swartz v. Berrien Springs Pub. Sch. Dist.*, No. 286285, 2009 WL 4163539, at *5 (Mich. Ct. App. Nov. 24, 2009).

At every stage in the investigation and termination, Defendants honestly believed that Plaintiff should be terminated. Greene and Pintsov conducted the investigation, found that the witnesses they interviewed were credible, that the incidents in Cancun actually

occurred, and recommended termination. (Greene Dep. at 375; Pintsov Dep. at 39.) They reported this recommendation to Schulman, Senior Vice President in Human Resources, he agreed with the recommendation and passed it along to Gentry, Midwestern Regional and Divisional President, and Hudson, Plaintiff's branch manger. (Schulman Dep. at 19, 20.)

Gentry ultimately made the decision to terminate Plaintiff. (Gentry Dep. at 21-22, 38.) He "relied heavily on [Greene's] expertise and professionalism," stating "[s]he was very good at what she did." (*Id.* at 46.) Gentry also honestly and reasonably believed that Plaintiff violated Defendants' policies. (*Id.* at 46-47.) Gentry stated that he would not normally have access to the investigation details, since the investigation was a private issue. (*Id.* at 24.) He stated that the standard termination policy and procedure after an investigation was to take the investigation findings and recommendation and carry out that recommendation. (*Id.* at 30.) He had no role in conducting the investigation and had no duty to find that the human resources department inappropriately conducted the investigation. (*Id.*) Although Gentry took the recommendation and carried it out, he still had the discretion to not terminate Plaintiff, but decided to terminate him based upon "the thorough investigation." (*Id.* at 32.) Gentry stated that he believed the investigation was thorough since he had been with AXA for 30 years and "had not seen a mistake during that period." (*Id.*) Gentry related the termination recommendation to Hudson, and Hudson carried out the termination.

Regarding Plaintiff's argument that Defendants terminated him to keep Glaspie from suing Defendants, Plaintiff has not brought forth any evidence that Glaspie threatened to sue or that Defendants took any alleged threat into when terminating Plaintiff. Plaintiff

points to two examples to prove that Glaspie threatened to sue Defendants. Plaintiff first points to a March 7, 2006 email in which Glaspie wrote to Greene and Pintsov: "Please give me an update on [the investigation status] or just let me know if I should let my attorneys run with these matters." (Pl.'s Suppl. Resp., Ex. 2.) Plaintiff next points to Bingham-Nelson's notes from her original conversation, which reflect that Glaspie "indicated that he has spoken to his parents about [his complaints against Defendants] and that his parents have three [attorneys] waiting to bring legal action against [Defendants] if his concerns are not addressed. [Glaspie] says he's advised his parents against formal legal action because he believes it can be addressed internally." (Defs.' Mot. for Summ. J., Ex. 10.)

Aside from offering these two points, Plaintiff has not proven that these statement constitute threats. Greene stated that she knew Glaspie had consulted with lawyers. (Greene Dep. at 365-66.) But Greene also stated that Glaspie never threatened to sue Defendants during her investigation and even if he had threatened legal action, she would have referred the claim to the law department. (*Id.* at 366-67.) Greene stated that the threatened legal action would have had no bearing on her investigation and she would have continued her investigation. (*Id.*) She further stated that Glaspie never demanded Plaintiff's termination. (*Id.* at 368.) Regarding Bingham-Nelson's initial notes, Glaspie impressed upon Bingham-Nelson that he did not want to take official legal action, he hoped instead that he could handle the matter internally. Plaintiff, on account of bringing forth no evidence of Glaspie's threats or Defendants action due to alleged threats, cannot use the email or notes to prove pretext.

## C. Defendants Did Not Breach Their Agreements with Plaintiff

Plaintiff has also brought a breach of contract claim against Defendants. Although a breach of contract claim does not give such deference to a business defendant as a discrimination claim, Plaintiff admittedly violated at least one company policy, which triggered the termination sections of his contracts. At least one of Defendants' policies to which Plaintiff was subject also gave Defendants the discretion to find a violation of the policy. Plaintiff's breach of contract claim thus fails to survive summary judgment.

Summary judgment is appropriate on a breach of contract claim "when the language of the contract is unambiguous, or if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material fact and permits interpretation of the agreement as a matter of law." *Reardon v. Kelly Serv., Inc.*, 210 F. App'x 456, 458 (6th Cir. 2006) (citation omitted). A court, in addition, must read a contract as a whole and not read single provisions in isolation. *Id.* (Internal quotation marks and citation omitted.)

### 1.    Plaintiff's Contracts with Defendants

Here, the Court finds that Defendants did not breach their three contracts with Plaintiff. Plaintiff's 14th Edition Agreement with AXA Network provided "[t]his [a]greement shall be terminable forthwith . . . if [Plaintiff] shall fail to comply with any of the provisions or conditions of this [a]greement." (14th Agreement, Defs.' Mot. for Summ. J., Ex. 2.) That contract also stated that "[t]his [a]greement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business. (*Id.*) Plaintiff's Registered Representative Agreement with AXA Advisors provided "[t]his [a]greement shall be terminable forthwith if [Plaintiff] shall fail to comply with any of the provisions or conditions of this [a]greement. (Registered Rep. Agreement, Defs.' Mot. for Summ. J., Ex. 3.) That contract also provided that "[t]his [a]greement is subject to, and

38

[Plaintiff] shall adhere to, all rules, regulations, policy guidelines . . . in the form of compliance guides or manuals, informational bulletins, notices or other written communications." (*Id.*) Finally, Plaintiff's District Manager Agreement with AXA Equitable provided "[t]his contract shall terminate automatically . . . if at any time there is no associate's agreement to secure applications for insurance and annuities in effect between [Plaintiff] and AXA Network to secure applications for insurance and annuities." (District Manager Agreement, Defs.' Mot for Summ. J., Ex. 5.)

The 14th Agreement and Registered Representative agreement call for termination if Plaintiff violates any AXA Network rule, regulation, or policy. Here, Defendants found that he did. Defendants specifically found that Plaintiff violated the company sexual harassment and misconduct policies, and the Professionalism Statement.

### a. The Harassment Policy

Defendants' sexual harassment policy states that "[s]exual harassment includes: (a) verbal or physical conduct of a sexual nature which has the purpose or effect of interfering with an individual's work performance, or of creating an intimidating, hostile, or offensive work environment . . . (e) physical assaults or physical conduct that is sexual in nature. (Harassment Policy, Defs.' Mot. for Summ. J., Ex. 14.) The harassment policy also states that "[Defendants] will not tolerate any form of harassment of or by any employee based on race, sex, sexual orientation. . . . Employees who engage in such conduct . . . will be subject to disciplinary action, up to and including termination." (*Id.*) Examples include "sexually suggestive comments, sexually-oriented 'kidding,' 'teasing' or 'practical jokes'"[.] (*Id.*)

Concerning complaints of harassment, Defendants' policy states: "All complaints of harassment will be promptly and thoroughly investigated by the Human Resources Department. At the conclusion of the investigation, the employee will be made aware of the results of the investigation. If the complaint of harassment has been substantiated, prompt and appropriate remedial action will be taken." (*Id.*)

### b. The Misconduct Policy

The misconduct policy defines "misconduct" without limitation. (Misconduct Policy, Defs.' Mot. for Summ. J., Ex. 15.) The Misconduct Policy explicitly includes include "sexual or racial harassment," but also includes a "violation of accepted standards of behavior." (*Id.*) When Defendants receive an alleged misconduct report, "Employee Relations will investigate the facts of the case and determine whether the behavior constitutes misconduct." (*Id.*) After the investigation, an executive vice president "must approve" the termination, or "must delegate termination authority to a senior vice president." (*Id.*) After approval a manager conducts the "Termination Discussion" and "should discuss only the verifiable facts that influenced the decision, i.e., the specific incident(s), and avoid vague statements that cannot be supported by objective evidence." (*Id.*)

### c. The Professionalism in the Workplace Statement

On August 16, 2005, Defendants released a professionalism in the workplace statement. This statement stated Defendants' commitment to a workplace that "cultivates such values as diversity, integrity and inclusion[.]" (Professionalism Statement, Defs.' Mot. for Summ. J., Ex 16.) The Professionalism Statement listed the policies it had to "achieve these objectives and provide all [of Defendants' employees] . . . guidelines for interacting with one another." (*Id.*) These policies included Defendants' Policy Statement on Ethics

40

as well as the Harassment policy, among others.  (*Id.*)  The Professionalism Statement reminded all employees that "[b]ehavior contrary to these policies is unacceptable in the workplace and in related settings outside of the workplace, such as . . . company-sponsored social events."  (*Id.*)  The Professionalism Statement also "reemphasized [Defendants'] commitment to maintaining a work environment that is free from harassment and discrimination."  (*Id.*)  Defendants states that harassment and discrimination could be "physical, visual, . . . or verbal" and could include "disparaging or insensitive remarks about gender, [or] sexual orientation."  (*Id.*)  The Professionalism Statement also included a list of behaviors that could constitute sexual harassment.  (*Id.*)

### 2. Defendants Did Not Breach Their Contracts with Plaintiff

Defendants did not breach any of the agreements with Plaintiff.  They did not breach the agreements because Plaintiff violated company policies.  Both Plaintiff's 14th Agreement and  Registered Representative Agreement provide for immediate termination if Plaintiff violates any of Defendants' policies.  Plaintiff's District Manager Agreement automatically terminated if Defendants terminated Plaintiff's other agreements.

Plaintiff violated the Harassment Policy when he made homosexually-slanted comments to Nazoyan.  Greene confronted Plaintiff with these comments and he admitted that he made the comments to Nazoyan.  (Sanford Dep. at 131-33.) The Harassment Policy explicitly states that Defendants do not tolerate sexually suggestive comments or sexually-oriented kidding, teasing, or practical jokes based upon a person's sexual orientation.  When Plaintiff made the comments and admitted that he made the comments, he violated the Harassment Policy.

Plaintiff violated the Misconduct Policy as well. The Misconduct Policy relevantly states that "Employee Relations will investigate the facts of the case and determine whether the behavior constitutes misconduct." This policy gives Defendants the discretion to determine what constitutes misconduct. Here, Greene and Pintsov found that Plaintiff's conduct violated the Misconduct Policy. They based their conclusion on all the circumstances that occurred and the investigations and interviews. The Misconduct Policy gives Defendants the ability to determine what constitutes misconduct. Even if the Misconduct Policy did not give Defendants the discretion to determine misconduct, Plaintiff admitted to making sexually-slanted comments to Nazoyan, which constitutes sexual harassment and also constitutes misconduct. Plaintiff therefore violated the Misconduct Policy.

The Professionalism Statement affirms Defendants' policies against sexual harassment. In this statement, Defendants stated that it viewed that harassment could include disparaging or insensitive remarks about sexual orientation. Because Plaintiff made such disparaging or insensitive remarks about sexual orientation, he violated the Professionalism statement.

Because Plaintiff violated at least three of Defendants' rules, regulations, or policies, and because the agreements that he executed with Defendants unambiguously call for immediate termination if Plaintiff violated an underlying rule, regulation, or policy, Defendants did not breach their contracts with Plaintiff.

### D. Defendants Did Not Tortiously Interfere with Plaintiff's Business Prospects

Plaintiff's third claim is that Defendants tortiously interfered with his business prospects.[29]    In Michigan, [t]he elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy and (4) resulting damage to the party whose relationship or expectancy was disrupted." *Health Call of Detroit v. Atrium Home & Health Care Serv., Inc.*, *706* N.W. 843, 849 (Mich. Ct. App. 2005).  For Plaintiff to have an actionable claim, the claimed interference must be "improper," requiring "both the absence of justification and the purpose of interfering with plaintiff's contractual rights or plaintiff's business relationship or expectancy." *Jemison v. Yukin*, No. 225441, 2002 WL 31376633, at * 1 (Mich. Ct. App. Oct. 22, 2002) (citation omitted).  Plaintiff can show improper interference by proving "the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Id.* (Citation omitted.)  If Plaintiff cannot prove a per se wrongful act, then he must demonstrate "with specificity, affirmative acts by [Defendants] that corroborate the improper motive of the interference." *Id.* (Citation omitted.)  But for Plaintiff's claim to be actionable, the business "expectancy must be a reasonable likelihood or probability, not mere wishful thinking." *Id.* (Internal quotation marks and citation omitted.)

---

[29]Defendants argue that Plaintiff can only bring his tortious interference claim against AXA Advisors since AXA Advisors was the only entity that submitted Plaintiff's U5.  Even if the Court were to apply the claim to all three Defendants, the claim would still fail, for the reasons stated.

Plaintiff first has failed to demonstrate that he had a valid business expectancy. *See Walker v. Braes Feed Ingredients, Inc.*, No. 02-9236, 2003 WL 1956162, at *6 (N.D. Ill. Apr. 23, 2003) (holding and citing cases for the proposition that "[t]he hope of receiving a job offer is not a sufficient expectancy" (under Illinois' tortious interference claim elements, which mirror Michigan's); "while the plaintiff's progression past the initial series or interviews speaks well of [his] candidacy, it does not by itself demonstrate a reasonable expectancy of employment" (insertion in original) (citations omitted)).

Plaintiff submitted four or five resumes, received interviews at each of the places to which he submitted a resume, and received one job offer, from John Hancock. (Sanford Dep. at 24-26.) Plaintiff has not demonstrated that he had a valid expectancy with any of the business with which he interviewed, save for John Hancock, from which he received an offer.

Even if Plaintiff could satisfy the second element, knowledge of a business expectancy, he still could not satisfy Michigan's requirement that Plaintiff prove Defendant's improper motive. Plaintiff has failed to demonstrate that Defendants actually induced a third party to break off a potential business relationship because of the U5's language. Plaintiff offers that Barrier's telling him that the U5 needed to be clearer substantiates his claim of an intentional act that interfered with his future business prospects. But, without proof that Defendants intentionally drafted the U5's language to prevent Plaintiff from getting future work, this claim cannot survive. *See Green v. Fidelity Investments*, No. 09-3247, 374 F. App'x 573, 579 (6th Cir. Mar.15 2010). In *Green*, the plaintiff argued that the U5 statements interfered with his prospective employment. (*Id.* at *5.) The Sixth Circuit did not find the plaintiff's argument persuasive since he pointed to no probative evidence

44

that no one would hire him because of the U5.  (*Id.*)  The Sixth Circuit found that the plaintiff's "conclusory allegations and subjective beliefs [were] not a sufficient basis to deny summary judgment."  *Id.* (Citations omitted.)  Here, as in *Green*, Plaintiff points to no evidence that no one would hire him, because Plaintiff was hired, despite the alleged improper U5 language.

Plaintiff makes three arguments why he should succeed on his tortious interference claim.  He first argues that Defendants intentionally interfered with his future business prospects with the U5 purely because he did not, in fact, violate any company policies.  (Pl.'s Resp. at 31.)  As this Court has found, Plaintiff did in fact violate company policies and therefore his first argument fails.  Plaintiff next argues that Defendant AXA Equitable's former violation of the Bullard-Plawecki Right to Know Act constitutes intentional tortious interference, since Plaintiff had no way to know the policies that Defendants alleged he violated.  Plaintiff's argument fails again.  Although Defendants may have intentionally failed to give Plaintiff his personnel file, that fact is not an intentional per se wrongful or a malicious act to interfere with a third party's business expectancy with Plaintiff.  Plaintiff, along with his second argument, states that the failure to provide his personnel file meant that he had no information why Defendants terminated him.  But, Hudson read the termination reasons to Plaintiff when he terminated Plaintiff; Plaintiff therefore knew the reasons.  Plaintiff finally argues that the U5's language, "[v]iolation of non-investment related company policies" is so vague as to warrant finding of an "intentional per se wrongful act."  (Pl.'s Resp. at 32.)  Here, as in *Green*, Plaintiff points to no evidence that this language interfered with his future employment, since he was hired within six or seven months after he was terminated.  Plaintiff's allegations are not enough to deny summary

judgment.  *See Green*, 374 F. App'x at 579 (holding that the plaintiff cannot withstand a summary judgment motion since he offered only assertions that no one would hire him; stating "[a] plaintiff's conclusory allegations and subjective beliefs are not a sufficient basis to deny summary judgment." (citations omitted)).  Here, Plaintiff says no one would hire him, but John Hancock did.  He therefore cannot show that the U5's language was so vague as to be an "intentional per se wrongful act."

## IV.    Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.

s/Nancy G. Edmunds

Nancy G. Edmunds
United States District Judge

Dated:  December 8, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 8, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer

Case Manager